ANDREA A. HALL

                **Plaintiff,**                **CIVIL ACTION NO. 05-CV-72019-DT**

    **vs.**                           **DISTRICT JUDGE ROBERT H. CLELAND**

**COMMISSIONER OF**                **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

                **Defendant.**
_____/

## REPORT AND RECOMMENDATION

## I.    RECOMMENDATION

This Court recommends that Defendant's Motion for Summary Judgment be **DENIED** (Docket # 19), that Plaintiff's Motion for Summary Judgment be **DENIED** (Docket # 16), and that the case be **REMANDED** for further proceedings consistent with this Report.

## II.    PROCEDURAL HISTORY

This is an action for judicial review of the final decision by the Commissioner of Social Security that Plaintiff was not "disabled" for purposes of the Social Security Act. 42 U.S.C. §§ 423, 1382. The issue for review is whether the Commissioner's decision is supported by substantial evidence.

Plaintiff Andrea Hall filed an application for Supplemental Security Income ("SSI") in October 2002. (Tr. 55-57, 58). She alleged she had been disabled since October 1, 1995 due fibromyalgia, arthralgia, tendonitis of both knees, high blood pressure, hand swelling, lower back

pain, depression, and crying spells.[1]  (Tr. 83).  Plaintiff's claim was initially denied.  (Tr. 44-48).

Plaintiff sought a review hearing before an Administrative Law Judge (ALJ).  (Tr. 49).  A hearing

took place before ALJ Thomas Walters on August 20, 2004.  (Tr. 333-65).  Plaintiff was represented

by an attorney at the hearing.  (Tr. 27, 335).  The ALJ denied Plaintiff's claim in a written opinion

issued on August 16, 2002.  (Tr. 28-43).  The Appeals Council denied review of the ALJ's decision

on March 12, 2005 and the ALJ's decision is now the final decision of the Commissioner.  (Tr. 5-

10).  Plaintiff appealed the denial of her claim to this Court and both parties have filed motions for

summary judgment.

## III.  <u>MEDICAL HISTORY</u>

In June 2000 Dr. Madhu Arora, Plaintiff's treating rheumatologist, wrote a letter stating that

she was treating Plaintiff for fibromyalgia and arthralgia.  She noted that Plaintiff complained of

generalized pain throughout her body.  (Tr. 288).

In 2001 Plaintiff underwent various tests to determine the cause of her reported pain and

numbness in her bilateral upper extremities.  (Tr. 196-202).  An EMG study was normal and showed

no evidence of local nerve entrapment, peripheral neuropathy, or cervical radiculopathy.  (Tr. 200-

01).  A nerve conduction study was also normal.  (Tr. 202).  X-rays taken of Plaintiff's pelvis,

abdomen, and hands were negative.  (Tr. 197-99).  On December 19, 2001 Dr. Arora wrote a letter

similar to the one written in 2000 which also provided a definition of fibromyalgia and arthralgia.

(Tr. 287).

---

[1]      Plaintiff filed a previous application for SSI in March 2000, which was ultimately denied.  The ALJ's denial was upheld by the Appeals Council.  The ALJ in the instant case declined Plaintiff's request to re-open the case and found that res judicata applied through August 12, 2002.  (Tr. 14-15).

Dr. Arora reported in February 2002 that Plaintiff had increased right knee and hip pain and was depressed. Plaintiff was crying and stated that she was tired of being in pain. Plaintiff reported that on some days it was too painful to use the toilet and that it felt as if her joints were swollen. Dr. Arora noted that Plaintiff had positive tender points consistent with fibromyalgia. She diagnosed Plaintiff with fibromyalgia with increased pain and depression. Dr. Arora prescribed Elavil. (Tr. 193-94).

On February 21, 2002 Plaintiff was evaluated at LifeWays by Barbara Watson, a nurse practitioner, for her complaints of depression (Tr. 314-17). It was noted that Plaintiff was seeing a counselor on a weekly basis. Plaintiff stated that her crying spells ceased once she started the Elavil prescribed by Dr. Arora. She claimed to have had suicidal thoughts but had no intent to harm herself because of her children. Plaintiff also reported feelings of restlessness, helplessness, hopelessness, decreased concentration and decision-making skills, isolation, irritability, and anger directed at her health problems. Plaintiff was upset and frustrated because she was not able to get disability benefits due to her physical impairments. She was sleeping 9 to 10 hours a day but with an unusual sleeping pattern. (Tr. 314). It was noted that Plaintiff arrived on time for her 10:00 a.m. appointment. *Id.* She was neatly and appropriately dressed. Plaintiff had appropriate eye contact, her speech was normal, and her psychomotor activity was within normal limits. (Tr. 316). She presented with a depressed affect but was alert and oriented and her insight and judgment were fair. *Id.* Plaintiff was diagnosed with dysthmia and assigned a Global Assessment of Functioning ("GAF") score of 55.[2] She was continued on Elavil. (Tr. 317).

---

[2]     A GAF score is a subjective determination based on a scale of 1-100 of "the clinician's judgment of the individual's overall level of functioning." *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* (Text Revision 4th ed.

The next month Plaintiff reported to Dr. Arora that she was feeling better since starting the Elavil. However, she was still depressed and in pain. (Tr. 191-92). Dr. Arora noted that Plaintiff had 10/18 positive tender points and her diagnosis remained unchanged. She recommended that Plaintiff try aquatic therapy or some other form of exercise but Plaintiff stated that she was afraid of water. (Tr. 192).

On June 27, 2002 Dr. Arora had a follow-up appointment with Plaintiff. Plaintiff reported that she had severe and constant pain in both knees. The medication helped but did not completely alleviate the pain. Dr. Arora ordered x-rays of Plaintiff's knees and prescribed a booster toilet seat. (Tr. 189-90). Subsequent x-rays showed there was a mild suspicion of suprapatellar joint effusions bilaterally but the x-rays were otherwise normal. (Tr. 195). X-rays taken of Plaintiff' lumbar spine and hips were negative. (Tr. 196).

A Psychological Assessment of Plaintiff was completed by her case manager Diane Copleand, B.A., on September 18, 2002 through CaseLinks Community Mental Health Center. (Tr. 158-64). Plaintiff reported that she needed someone to talk to and wanted help contesting the denial of her social security benefits. (Tr. 158). Ms. Copeland noted that Plaintiff was depressed, did not feel good about herself, and tended to isolate herself. She believed that Plaintiff required assistance in accessing community resources and social opportunities. *Id.* Ms. Copeland estimated that Plaintiff had average intellectual functioning with no learning impairments. *Id.* A mental status examination revealed that Plaintiff's appearance and behavioral posture were normal although her affect suggested anxiety, fear, depression, sadness, anger, and humility. (Tr. 162). Plaintiff's

---

2000) 32-34. ("DSM-IV"). A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. *Id.*

speech, thinking, thought content, and orientation were unimpaired. Plaintiff denied any hallucinations or suicide attempts or plans although she did report suicidal ideation in the past. Plaintiff also reported an impaired ability to manage daily living skills and an impaired recent memory. *Id.* However, Plaintiff's did not have an impaired ability to make reasoned decisions and her immediate recall and remote memory were unimpaired. *Id.* Ms. Copeland diagnosed Plaintiff with major depressive disorder, single episode, severe, dysthmic disorder, and agoraphobia without a history of panic disorder. (Tr. 164). She assigned Plaintiff a GAF score of 39.[3]

Plaintiff returned to Dr. Arora on September 27, 2002 complaining of constant pain and aching all over her body, especially her knees and neck. Plaintiff stated that the medication helped but that on some days she could not even move. (Tr. 187). Dr. Arora noted that Plaintiff initially refused to get injections but then agreed to consider it. (Tr. 188).

Plaintiff saw Dr. Arora again and stated that she still had pain in her knees. She was sleeping better with the Elavil but she still could not sleep throughout the night. (Tr. 185). Plaintiff refused injections in her knees although Dr. Arora told her that it was an option if the pain got too bad. Ultracet was prescribed in addition to Plaintiff's other medication. (Tr. 186). Dr. Arora prepared another letter for Plaintiff indicating that Plaintiff was unable to work at the present time due to her fibromyalgia and arthralgia. (Tr. 286). Plaintiff also saw Dr. Shazad Shaikh at the Center for Family Health. (Tr. 213). Plaintiff reported that she was feeling weak and tired. She also had chest

---

[3]    A GAF of 31-40 is extremely low, and "indicates [s]ome impairment in reality testing or communication · · · [or] major impairment in reality testing or communication · · · [or] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." DSM-IV at 32.

pain and shortness of breath. An EKG was normal. Plaintiff was diagnosed with atypical chest pain and prescribed Tylenol #3. (Tr. 213-14).

Plaintiff returned to Dr. Shaikh in December 2002. Her chest pain was much improved and she was taking Tylenol #3 only occasionally. Dr. Shaikh prescribed a bathtub seat to help with her fibromyalgia symptoms. (Tr. 212). Plaintiff also saw Barbara Watson at LifeWays. (Tr. 312-13). Plaintiff was still seeing a counselor but it was her last counseling session that week. She reported that her medication made her dizzy and tired but helped with her depression. Plaintiff was sleeping an average of 7 hours a night and her appetite was good. She denied any suicidal or homicidal ideation or hallucinations. It was noted that Plaintiff arrived on time for her 10:00 a.m. appointment and she was appropriately dressed with good grooming and hygiene. Plaintiff was pleasant and cooperative with good eye contact. Her speech and psychomotor activity were normal. Plaintiff presented with a mildly depressed affect but she was oriented with good insight and judgment. (Tr. 312-13). Plaintiff was diagnosed with major depressive disorder, recurrent and moderate. She was continued on a decreased dosage of Elavil. (Tr. 313).

In January 2003 Dr. Brandon Russell, D.O. performed a consultative examination of Plaintiff at Defendant's request. (Tr. 215-19). Plaintiff told Dr. Russell that she had been diagnosed with fibromyalgia, which caused multiple pains of a non-specific origin. She took several medications to treat her fibromyalgia and to help her sleep. (Tr. 215). Plaintiff denied using an assistive device to walk but she did wear bilateral knee braces and bilateral carpal tunnel splinting. According to Plaintiff, she could sit for 30 minutes, stand for 15 minutes, walk for 15 minutes but no more than 200 feet, and occasionally lift five pounds. Plaintiff also reported a decreased ability for adult daily living and an inability to grocery shop. *Id.*

Dr. Russell observed that Plaintiff was cooperative and pleasant throughout the examination. (Tr. 216). Although Plaintiff wore bilateral upper and lower extremity splints, Dr. Russell noted that removal of the splints revealed no atrophy of her extremities. Plaintiff's gait was normal. She had a full range of motion in all of her joints. There was no tenderness, erythema, or effusion of any joint. Straight leg raising tests were negative. Grip strength and dexterity were intact. Plaintiff was able to pick up a coin, button a button, open a door without difficulty, and get on and off the examination table without difficulty. She was also able to heel and toe walk, squat, and hop without difficulty. *Id.* Plaintiff's motor and sensory functioning was also intact. (Tr. 219).

Plaintiff was evaluated by Dr. Craig S. Brown, a licensed psychologist, in February 2003 at Defendant's request. (Tr. 220-26). Plaintiff reported that she was sad, cried a lot, and had urges to harm herself. She also stated that her home chore provider had recently talked her out of a suicide attempt. Plaintiff also told Dr. Brown that her medication did not help very much and that her pain caused her depression. For the last 10 months, Plaintiff thought that people were talking about her so she tended to stay at home and away from the public. Plaintiff further stated that she wanted to be admitted to a psychiatric hospital but her counselor did not support her wish. Her counselor had also recently terminated services and told Plaintiff that she "could get by" with a case manager through CaseLinks. (Tr. 221). Plaintiff reported having a significant problem remembering her past work experience. She believed that she worked as home chore provider for her mother until 1995 and that she performed this work for a few years but she was not certain. *Id.* Plaintiff also stated that she did not believe that she remembered things very well and that CaseLinks had ordered an IQ test. (Tr. 222).

In terms of daily functioning, Dr. Brown noted that Plaintiff related well to him in the office. However, Plaintiff did not have a very close family and had no co-workers or employers with whom to interact. Plaintiff's only reported friend was her home chore worker but this was a materialistic relationship. Plaintiff also became nervous and sweaty around crowds and believed that others were talking about her. Notwithstanding, she was still able to shop at Meijers with her home chore provider. (Tr. 222). Plaintiff denied having any past or present interests or hobbies. She stated that sleep was not much of a problem for her and she was able to sleep for six or seven hours a night. Plaintiff awoke around 6:00 a.m. to get her son to school but would then go back to bed until 11:00 a.m. or noon. She spent her day sleeping, eating, and watching 10 to 11 hours of television. *Id.*

Dr. Brown observed that Plaintiff's posture, gait, manners, clothing, hygiene, and grooming were adequate and appropriate. She had good eye contact. Plaintiff stated that she could groom and dress herself although she needed some help with bathing. (Tr. 223). Dr. Brown also noted that he observed Plaintiff get out of a car, walk across the parking lot and up the stairs, and seat herself in the office chair. She was also observed leaving the office, descending the stairs, walking across the parking lot, and getting into a car. Dr. Brown indicated that he observed absolutely no indication of any pain when Plaintiff performed these activities. *Id.*

A mental status examination revealed that Plaintiff had perhaps partial insight and her self esteem was low. However, she was fairly relaxed and pleasant during the interview, did not appear clearly anxious, and did not display any unusual behaviors. Plaintiff presented herself well orally. She was well organized and her speech was clear and understandable. Plaintiff's language was appropriate for her education and environment. Her speech was rather spontaneous but was not illogical, vague, slowed, abstract, circumstantial, or pressured. (Tr. 223). Although Plaintiff

claimed to have a poor memory and to be rather concrete, Dr. Brown noted that she did not seem as concrete as expected. Plaintiff claimed that she experienced a visual hallucination about four months ago but this had not recurred. She denied any other obsessions or hallucinations aside from general feelings of persecution when in public. *Id*. Plaintiff did appear depressed and she seemed quite discouraged. Dr. Brown did not believe that Plaintiff had major depression but felt that she had a moderate dysthymic disorder with overeating junk food, hypersomnia, low energy and fatigue, low self esteem, poor concentration, difficulty making decisions, and feelings of hopelessness. (Tr. 223-24). He assigned Plaintiff a GAF score of 52. (Tr. 225).

On February 10, 2003 a state agency medical consultant reviewed Plaintiff's medical records and completed a Physical Residual Functional ("RFC") Assessment form. (Tr. 227-34). The consultant concluded that Plaintiff's fibromyalgia did not result in any functional limitations and that Plaintiff's subjective complaints were not credible. *Id.*

Plaintiff returned to Dr. Arora in February 2003 stating that she had increased pain in her hands and feet. Dr. Arora noted that Plaintiff had increased swelling of the joints upon examination. (Tr. 284-85). On February 28, 2003 x-rays were taken of Plaintiff's wrists, hands, feet, ankles, and knees. (Tr. 289-90). Minimal degenerative changes were seen at both knees and the right hand. Early degenerative changes were seen at the left foot and hand. A minimal valgus deformity was seen in Plaintiff' right foot. X-rays of Plaintiff's ankles and wrists were negative. *Id.* Dr. Arora reported that x-rays showed arthritis in Plaintiff's knees, feet, and fingers. (Tr. 283).

On March 12, 2003 Dr. W.H. Van Houten, another state agency medical consultant, also reviewed Plaintiff's medical records and completed a Psychiatric Review Technique form. (Tr. 236-49). Dr. Van Houten concluded that Plaintiff had a non-severe mental impairment consisting of a

dsythymic disorder.  Dr. Van Houten found that Plaintiff had mild to moderate restrictions of daily living due to pain, mild difficulties in maintaining social functioning and concentration, persistence, or pace, and no episodes of decompensation.  (Tr. 246).

On March 28, 2003 Plaintiff stated that she continued to hurt despite her medications but that she was trying to exercise at home everyday.  Plaintiff also stated that she had a phobia of people and did not go out much.  Dr. Arora increased Plaintiff's dosage of Neurontin and recommended water exercises after 3 weeks.  (Tr. 281-82).

Plaintiff reported that she was doing better in June 2003.  She stated that she still had pain everywhere and that it was quite bad on some days.  Plaintiff's medications were continued and she was advised to exercise.  (Tr. 279-80).  Plaintiff was also seen by Barbara Watson at LifeWays.  It was noted that she was a medication-only patient and was no longer seeing a counselor.  Plaintiff denied any side effects from her medication.  She stated that she was sleeping fairly well at night for about 6 to 7 hours.  Plaintiff indicated that she had one episode in the past three months wherein she had suicidal thoughts but that she knew she would not hurt herself for the sake of her children.  (Tr. 310).  Plaintiff arrived on time for her 9:00 a.m. appointment and was dressed appropriately.  Her eye contact, grooming, and hygiene were good.  Plaintiff's speech was normal although she had a mildly depressed affect.  Her insight and judgment were good.  *Id.*  Plaintiff's diagnosis and prescribed medication remained unchanged.  (Tr. 311).

Plaintiff returned to LifeWays in August 2003.  She reported that her medication was very effective for her depression and insomnia.  However, Plaintiff experienced eye twitching that she associated with the Elavil.  She was sleeping an average of 7 hours per night.  (Tr. 308).  Plaintiff denied any significant problems with depression, anxiety, or anger.  *Id.*  It was noted that Plaintiff

arrived on time for her 11:30 appointment. Her mental status examination was normal and she displayed an euthymic affect and congruent mood. Plaintiff's Elavil was continued at a lower dosage. (Tr. 308-09).

Dr. Arora saw Plaintiff in September 2003 for her continuing complaints of pain. Plaintiff's Elavil had been decreased due to eye twitching and Plaintiff stated that she was not sleeping as well. Plaintiff's medication was subsequently adjusted. (Tr. 277-78). Plaintiff also saw Barbara Watson at LifeWays. Plaintiff reported that she was not sleeping as well at night because of the decrease in Elavil but that her eye twitching had stopped. She preferred no twitching over more sleep, which was about 4 to 5 hours a night. Plaintiff denied any significant problems with depression, anxiety, or anger but stated that she still became nervous in stores. Plaintiff's mental status examination was essentially the same as previously reported. (Tr. 306-07). Plaintiff was continued on Elavil. (Tr. 307).

Dr. Arora completed a form entitled "Medical Source Statement Concerning Claimant's Ability to Engage in Work Relations" on December 14, 2003. (Tr. 250-54). Dr. Arora indicated that she had treated Plaintiff since November 1999. Plaintiff had fibromyalgia and arthralgia with a poor prognosis for recovery. (Tr. 250). Dr. Arora stated that Plaintiff's symptoms, which dated back to 1999, included multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, numbness and tingling, anxiety, and depression. (Tr. 250, 254). Plaintiff experienced pain in her shoulders, arms, hands/fingers, hips, legs, and knees/ankles/feet. (Tr. 251). Her pain was constant and severe and was precipitated by changing weather, cold, fatigue, hormonal changes, movement/overuse, and stress. *Id.* Dr. Arora further noted that Plaintiff's pain was severe enough to interfere with her attention and concentration "often", which was defined as 50% of the time, and

that Plaintiff was incapable of handling a low stress job. (Tr. 252). According to Dr. Arora, Plaintiff also had good days and bad days and would, on average, be absent from work due to treatment or her impairment more than 4 times a month. (Tr. 254). Dr. Arora did not assess any of Plaintiff's functional limitations. (Tr. 252-54).

On December 23, 2003 Plaintiff reported to Barbara Watson that Elavil was helping with her depression although she still felt a little anxious. Her sleeping had improved although she woke up frequently during the night. Plaintiff stated that she wanted to remain on Elavil because it helped with her pain. Barbara Watson noted that Plaintiff's depression and anger were fairly well-controlled but she still had problems with anxiety. Plaintiff's mental status examination was essentially normal.

Chest x-rays taken in January 2004 remained negative. (Tr. 270). Plaintiff continued her treatment with Dr. Arora from January 2004 to July 2004. (Tr. 271-76, 298-300). Plaintiff's complaints of pain continued. *Id.* Plaintiff was also prescribed a 3-way lift chair. (Tr. 297).

On June 24, 2004 Plaintiff saw a different nurse practitioner at LifeWays. Plaintiff presented as depressed, sad, and anxious and she was mildly labile. She was sleeping 8 hours a night with frequent periods of wakefulness and reported that her eye twitching had returned. Plaintiff was appropriately dressed, her makeup was neatly applied, and she was well-groomed. Plaintiff had good eye contact and smiled occasionally during the interview. Her psychomotor activity was mildly retarded but her speech was normal. Plaintiff's insight was limited although her judgment was fair. Plaintiff requested that her Elavil be discontinued. She was therefore started on a new medication. (Tr. 302-03).

On July 6, 2004 Dr. Shaikh completed a form regarding Plaintiff's ability to perform work-related activities. (Tr. 321-24). Dr. Shaikh stated that Plaintiff had fibromyalgia, degenerative arthritis, and depression and that her prognosis was poor. He believed that Plaintiff's impairments would frequently (75% of the time) interfere with her concentration and attention and that Plaintiff was markedly limited in her ability to cope with work stress. (Tr. 321-22). Dr. Shaikh also concluded that Plaintiff could only: (1) walk for 1 city block but for no more than 5 minutes; (2) sit and stand for 10 minutes at a time but for less than 2 hours in an 8-hour workday; (3) lift/carry less than 10 pounds occasionally; (4) finger, handle, and reach for 5% of the workday; and (5) bend/twist for 2% of the workday. (Tr. 322-23). He stated that Plaintiff was not required to elevate her feet with prolonged sitting and did not need an assistive device for walking. (Tr. 323). Dr. Shaikh further noted that Plaintiff was absent from work more than 3 times a month due to her impairments or treatment. (Tr. 324). He stated in conclusion that Plaintiff was unable to work and "declared" her to be disabled. *Id.*

## IV. HEARING TESTIMONY

### A. Plaintiff's Testimony

Plaintiff was 48 years old when the ALJ issued his written decision. She had completed the 9th grade of high school. (Tr. 337). Plaintiff testified that she had pain throughout her entire body and swelling of her feet, knees, and legs. (Tr. 341-42). She wore braces on her arms and knees all of the time because she had no strength in her extremities. *Id.* Plaintiff testified that it was hard for her to climb stairs because of leg and back pain. (Tr. 340). The pain also made it difficult for Plaintiff to sit and stand. (Tr. 351). Plaintiff rated her pain as over a 10 on a scale of 1 to 10. *Id.* Plaintiff stated that she could grip and grasp small items but she did not have a lot of

strength. She also could not use her arms for overhead work or repetitive work over the course of 8 hours. (Tr. 354-55). Plaintiff estimated that for 1/3 of a workday, she could lift no more than 5 pounds from the floor to her waist and from her waist to overhead. (Tr. 355). She could not sit for too long before the pain caused her to get up and could stand for no more than 10 minutes before she had to sit. (Tr. 355-56). Plaintiff further stated that she could not stoop or bend. (Tr. 357). To alleviate her pain, Plaintiff testified that she had to lie down or recline in her lift chair with a heating blanket and with a pillow under her knees for about an hour after she took her medication. It took about 45 minutes for her pain to diminish. (Tr. 352). Plaintiff also used a pillow placed behind her back when she sat to ease her pain. (Tr. 353).

According to Plaintiff, she had good and bad days. On bad days, Plaintiff stayed in bed all day. She was also assisted by either a home healthcare worker or her son who cleaned the house, ran errands, did the laundry, went shopping, and picked up Plaintiff's medication. (Tr. 348). Plaintiff testified that she did not perform any of these activities. (Tr. 349). She groomed herself but not every day. She sometimes needed help to shower and she used a special chair so that she could sit while she showered. *Id.* She only drove in an emergency and she did not use public transportation. Plaintiff's healthcare provider would coordinate transportation for her if she needed to travel. To get into the transport van, Plaintiff used a lift chair, which allowed her to remain fully reclined. (Tr. 349-50, 357). On a typical day, Plaintiff went to bed around 11:30 p.m. or 12:00 a.m. and arose at about 2:00 p.m. (Tr. 350). She would also awake several times during the night because something was on her mind or because of neck and back pain. *Id.* Plaintiff took medication for her pain and depression but it did not fully alleviate her symptoms. (Tr. 351, 352). Her medication also caused dizziness and drowsiness. (Tr. 354).

Plaintiff further stated that she was depressed and that she was being treated by a therapist at LifeWays. (Tr. 343). As a result of her depression, Plaintiff cried for no reason and was always sad and angry at herself for being sick. (Tr. 345). She could not remember things and did not visit with anyone outside of her home although her sister sometimes visited. (Tr. 345-46, 347). She did not like being around crowds so she often went to stores either very late or early to avoid people. (Tr. 346). Plaintiff told the ALJ that she had thought about suicide in the past and had a plan for committing suicide. (Tr. 346).

### B.  <u>Vocational Expert's Testimony</u>

Sandra Steele, a vocational rehabilitation consultant, testified as an expert at the hearing. (Tr. 359-64). The ALJ asked Ms. Steel what work would be available for a hypothetical person of Plaintiff's age, education, and work experience who had the RFC to perform unskilled, entry-level, sedentary work with a sit/stand option every 30 minutes, occasional pushing, pulling, gripping, and grasping, no public contact, and limited contact with co-workers. (Tr. 359). Ms. Steele testified that there would not be any jobs available for such an individual. Upon further questioning by the ALJ, Ms. Steele clarified that there are 3,200 surveillance monitor positions available for such an individual in the lower peninsula of Michigan. (Tr. 361-62). There were also approximately 2,500 jobs as order clerks or general office clerks that would fit the ALJ's hypothetical but would not permit an individual to alternate his or her position every 30 minutes at-will or on a specific schedule. (Tr. 360-61).

### V.  <u>LAW AND ANALYSIS</u>

## A.    <u>STANDARD OF REVIEW</u>

Title 42 U.S.C. § 405(g) gives this Court jurisdiction to review the Commissioner's decisions.  Judicial review of those decisions is limited to determining whether her findings are supported by substantial evidence and whether she employed the proper legal standards. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997).  Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  It is not the function of this court to   try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility.  *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

In determining whether substantial evidence supports the Commissioner's decision, the Court must examine the administrative record as a whole.  *Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).  If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even where substantial evidence also supports the opposite conclusion and the reviewing court would decide the matter differently.  *Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).

## B.    <u>FRAMEWORK OF SOCIAL SECURITY DISABILITY DETERMINATIONS</u>

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis.  In the first four steps, Plaintiff had to show that:

(1)    he was not presently engaged in substantial gainful employment; and

(2)    he suffered from a severe impairment; and

(3)    the impairment met or was medically equal to a "listed impairment;" or

(4)     he did not have the residual functional capacity (RFC) to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e); 20 C.F.R. § 416.920(a)-(e). If Plaintiff's impairments prevented him from doing his past work, the Commissioner would, at step five, consider his RFC, age, education and past work experience to determine if he could perform other work.  If not, he would be deemed disabled.  20 C.F.R. § 404.1520(f).  The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391.

## C.     ARGUMENTS

Plaintiff challenges the ALJ's RFC findings on three grounds.  She asserts that the ALJ failed to properly: (1) apply Social Security Ruling ("SSR") 99-2p in addressing Plaintiff's fibromyalgia; (2) give controlling weight to the opinions of Dr. Arora and Dr. Shaikh regarding Plaintiff's  mental and physical limitations and inability to work; and (3) assess the credibility of Plaintiff's statements regarding the pain and symptoms caused by her fibromyalgia and depression.

### 1.     SSR 99-2p

Plaintiff cites to SSR 99-2p, 1999 WL 271569, at *1 (April 30, 1999), and suggests  that the ALJ failed to follow its dictates when analyzing Plaintiff's fibromyalgia.  (Pl.'s Mot. for Summ.J. at 11-13).  SSR 99-2p explains that fibromyalgia can constitute a severe, medically determinable impairment in certain cases.  *Id.*  The ALJ determined that Plaintiff had established the existence of fibromyalgia as a severe, medically determinable impairment.  Therefore, the ALJ did not fail to comport with SSR 99-2p's mandate in this regard.

Nevertheless, Plaintiff points to a comment in SSR 99-2p which notes that statements from a claimant's treating medical source regarding "the nature and severity of an individual's

impairments are entitled to deference and may be entitled to controlling weight." *Id.*, at * 7. This comment, however, does not reference a rule that is unique to cases involving fibromyalgia. Rather, it mirrors the rules found in 20 C.F.R. § 416.927(d) and SSR 96-2p and 96-5p, which are applicable to the evaluation of all medical impairments. Indeed, SSR 99-2p specifically states that when assessing a claimant's limitations, the same sequential process used for evaluating all other types of impairments in social security cases is used when addressing fibromyalgia cases. SSR 99-2p, at * 4. Plaintiff's allegation regarding a violation of SSR 99-2p is therefore subsumed within her argument that the ALJ erred by failing to consider and accord controlling weight to the opinions of her treating physicians, Dr. Arora and Dr. Shaikh, which is addressed below.

### 2. Treating Physician's Doctrine and Plaintiff's Credibility

Plaintiff contends that the ALJ failed to give controlling weight to the opinions of Dr. Arora and Dr. Shaikh regarding Plaintiff's mental and physical limitations and inability to work. She also asserts that the ALJ improperly assessed the credibility of her statements regarding her pain and other symptoms caused by fibromyalgia and depression.

### a. General Legal Principles

In reviewing medical evidence involving a treating physician's opinions, the ALJ is required to follow specific procedural rules. As the Sixth Circuit stated in *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997), "[i]n general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimant's only once." Indeed, 20 C.F.R. § 416.927(d)(2) provides that a treating source's opinion regarding the nature and severity of a claimant's condition is entitled to controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence" in the record.  *See Walters*, 127 F.3d at 530.  If an ALJ rejects a treating physician's opinion, she must "give good reasons" for doing so in her written opinion."  20 C.F.R. § 416.927(d)(2); *see also Wilson*, 378 F.3d 541-46; SSR 96- 5p and 96-2p.

Similarly, the ALJ must adhere to certain regulations when assessing a claimant's subjective complaints.  The Sixth Circuit has developed a two-prong test to evaluate a claimant's assertions of disabling pain:

> First, we must examine whether there is objective medical evidence of an underlying medical condition. If there is, then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Duncan v. Secretary of Health & Human Servs*., 801 F.2d 847, 853 (6th Cir.1 986)); see also 20 C.F.R. § 416.929(a).

Notwithstanding the above, the ALJ cannot rely solely on the lack of objective medical evidence.  *See* 20 C.F.R. § 416.929(c)(2).  In addition to the available objective medical evidence, the ALJ must therefore consider evidence such as the claimant's daily activities, precipitating and aggravating factors, medication effectiveness, and any other treatment or measures used for pain relief.  *See* 20 C.F.R. § 416.929(c)(3); *see also Felisky v. Bowen*, 35 F .3d 1027, 1039-40 (6th Cir. 1994) (applying these factors).

Moreover, because pain is a largely subjective matter, an ALJ may properly consider the claimant's credibility in evaluating her complaints of disabling pain.  *See Walters*, 127 F.3d at 531. "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence."  *Id.* An ALJ's findings based on the

credibility of the claimant are to be accorded great weight and deference. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence. *See id.*

**b.** **Fibromyalgia Caselaw**

Fibromyalgia is defined as follows:

> A syndrome of chronic pain of musculoskeletal origin but uncertain cause. The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as in an axial distribution (cervical, thoracic, or lumbar spine or anterior chest); additionally there must be point tenderness in at least 11 of 18 specified sites.

*Stedman's Medical Dictionary*, 27th Ed., 2000, at 671. Fibromyalgia is a "mysterious" and "elusive" disease with no known cure. *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003), citing *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996). It is also a disease of exclusion and is often diagnosed only after ruling out "other medical conditions which may manifest fibrositis-like symptoms of musculoskeletal pain, stiffness, and fatigue." *Green-Younger v. Barnhart*, 335 F.3d 99, 109 (2d Cir. 2003), quoting *Preston v. Sec. of Health & Human Srvs.*, 854 F.2d 815, 819 (6th Cir. 1988). Generally, no laboratory test can confirm its presence or severity and physical examinations usually yield normal findings such as a full range of motion, no joint swelling, normal muscle strength, and normal neurological reactions. *Preston*, 854 F.2d at 818; *Sarchet*, 78 F.3d at 306.

Fibromyalgia by itself can be disabling. *See Preston*, 854 F.2d 815. However, because its symptoms are entirely subjective, they are easy to fake. *Sarchet*, 78 F.3d at 306. As the *Sarchet* Court noted "some people may have such a severe case of fibromyalgia as to be totally disabled from working . . . but most do not and the question is whether [claimant] is one of the minority. *Id.* (citations omitted).

The Sixth Circuit has recognized the importance of an ALJ's proper assessment of a claimant's treating physician's opinions and the claimant's credibility in cases involving fibromyalgia. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 243-49 (6th Cir. 2007). As another court noted, the severity of a claimant's fibromyalgia and any resulting limitations depends heavily upon the opinions of claimant's treating physicians, which necessarily depend upon an assessment of the claimant's subjective complaints. *Swain*, 297 F. Supp. 2d at 990. Consequently, "[t]his places a premium . . . in such cases on the assessment of the claimant's credibility. *Id.*

### c.    Plaintiff's Mental Limitations

Plaintiff asserts that the ALJ's RFC finding fails to account for the opinions of Dr. Arora and Dr. Shaikh regarding her mental limitations. Specifically, the doctors opined that Plaintiff's impairments were severe enough to interfere with her attention and concentration for 50% to 75% of the workday and that Plaintiff was incapable of handling a low stress job. (Tr. 252, 321-22). Plaintiff also asserts that the ALJ erred in assessing her complaints that it was difficult for her to "remember things" and to interact socially with strangers.[4]

The ALJ considered the doctors' opinions and Plaintiff's subjective complaints but determined that, based upon the evidence as a whole, Plaintiff nevertheless remained capable of performing unskilled, entry level work with no detailed instructions or public contact and with

---

[4]      Plaintiff also testified that she had suicidal ideations with a plan by which to kill herself and that she suffered from crying spells. It is not clear whether Plaintiff contends that these symptoms should have been factored into the ALJ's RFC finding or even how such symptoms would impact her RFC. In any event, the record evidence indicates that Plaintiff's crying spells ceased once she started on Elavil in February 2002. (Tr. 314). Moreover, Plaintiff's mental health treatment notes indicate that Plaintiff reported suicidal ideation in February and July 2002 but with no suicidal intent or plans. Thereafter, with the exception of one incident in 2003, Plaintiff denied having any suicidal ideations or intent.

limited contact with co-workers.  The ALJ noted that the opinions of Dr. Arora and Dr. Shaikh regarding Plaintiff's mental status were not supported by any of their own clinical findings.  (Tr. 22). Indeed, Plaintiff has not directed this Court to any evidence in the doctors' treatment notes that reflects a verification of Plaintiff's allegedly severe concentration difficulties.  Furthermore, the ALJ thoroughly discussed the findings that were made by mental health evaluators.  (Tr. 18-19, 21-22). As mentioned by the ALJ, Plaintiff was generally described as being appropriately groomed, pleasant, fully oriented, and cooperative with good eye contact.  She exhibited normal speech and psychomotor activity.  Plaintiff fairly consistently demonstrated intact judgment and insight. Plaintiff's affect was generally either mildly depressed or euthymic.  Although Plaintiff reported that her recent memory was impaired, she did not claim to have an inability to make reasoned decisions, to immediately recall information, or to access remote memories.  (Tr. 162).  Dr. Brown reported that Plaintiff presented herself well orally and had well-organized speech that was clear and understandable.  He also noted that Plaintiff could perform simple addition and subtraction calculations accurately.  (Tr. 220-26).  The ALJ further noted that Plaintiff was cognitively able to read items such as a driver's exam, street signs, and occasionally the Bible, to do crossword puzzles, and to successfully take in a written driver's examination.[5]  (Tr. 21).  Given this evidence as a whole, the Court cannot conclude that the ALJ's assessment of Plaintiff's mental RFC lacks the support of substantial evidence.

### b. Plaintiff's Physical Limitations

The ALJ also concluded that Plaintiff had the physical RFC to perform work that

---

[5]     The Court also notes that Plaintiff consistently arrived at her mental health appointments on time, indicating that Plaintiff had the mental wherewithal to attend to tasks in a timely manner.

provided for a sit/stand option every 30 minutes and that involved: (1) lifting/carrying no more than 10 pounds; (2) occasionally pushing, pulling, gripping, and grasping; and (3) no prolonged walking. (Tr. 21).

Plaintiff asserts that the ALJ erred in ignoring the opinions of Dr. Arora and Dr. Shaikh and in rejecting her subjective complaints as not fully credible when crafting this RFC finding. Both doctors opined that Plaintiff was disabled as a result of her fibromyalgia. They also concluded that Plaintiff's impairments and treatment would cause her to be absent from work more than 3 to 4 times per month and that Plaintiff took medication that could cause dizziness and drowsiness. Moreover, Dr. Arora opined that Plaintiff's pain was constant and severe and was precipitated by cold, environmental changes, fatigue, and movement/overuse. Unlike Dr. Arora, Dr. Shaikh also indicated that Plaintiff's pain resulted in specific functional limitations regarding Plaintiff's ability to walk, sit/stand, lift/carry, grip, grasp, and reach. Plaintiff testified that she was physically incapable of performing sedentary work, had to lie down, recline in a lift chair, or nap for most of the day, had "bad days" in which she was bedridden, needed assistance with almost all daily activities, and took medication that was only partially effective and caused drowsiness and dizziness.

The ALJ generally discussed the opinions of Dr. Arora and Dr. Shaikh. In doing so, he correctly noted that an ALJ is not bound by the doctors' ultimate opinion that Plaintiff was disabled as this is an issue reserved for the Commissioner. *See* 20 C.F.R. § 416.927(d)(2); SSR 96-2p. (Tr. 22). Furthermore, as noted previously, the ALJ properly recognized that fibromyalgia is not *per se* disabling. *Id.*

It is the ALJ's rejection of the specific functional limitations set forth by Dr. Arora and Dr. Shaikh and as alleged by Plaintiff that is more problematic. It is clear from the ALJ's opinion that

he regarded the lack of objective, medical tests and clinical findings as significant factors undermining the physician's opinions and Plaintiff's credibility. (Tr. 20-22). However, as the Sixth Circuit has recently emphasized, such objective evidence is not "particularly relevant" in cases involving fibromyalgia. *Rogers*, 486 F.3d at 245, citing to *Preston*, 854 F.2d at 820.[6] This is not to say that *all* objective, medical evidence cannot be used to test the supportability of a treating physician's opinion or a Plaintiff's credibility regarding the effects of fibromyalgia.[7] For example, the *Preston* court looked to factors such as whether the claimant underwent physical therapy or trigger point injections, was referred to a pain clinic, or was hospitalized. *Preston*, 854 F.2d at 820. Moreover, as with any case, the ALJ should examine the whether the doctors' treatment notes actually reflect the complaints/symptoms/effects which Plaintiff alleges or which the doctors contend result from her fibromyalgia such as necessary absences of work for more than 3 or 4 times per month, a medical need for leg elevation, the side effects of medication (drowsiness, dizziness, required daytime naps), and environmental aggravation of pain.[8] Furthermore, the ALJ should examine any inconsistencies between Plaintiff's functional capacity as averred by Plaintiff versus her physicians or any failure by Plaintiff to follow a prescribed treatment plan (if he considers the Plaintiff's reasons for not doing so). *See* SSR 96-7p. Nevertheless, the Court's review of the ALJ's

---

[6] Although *Rogers* and *Preston* involved cases in which the ALJs, unlike the case at hand, had failed to even recognized that the claimant's fibromyalgia was a severe impairment, the Court cannot discern any basis for concluding that the cases' overall analysis is inapplicable in this situation.

[7] If such were the case, it would be virtually impossible to find that fibromyalgia was *not per se* disabling in the face of a claimant's subjective complaints.

[8] In cases involving fibromyalgia, an ALJ may also need to examine the rheumatologist's notes to assess whether there are any fluctuations in the number of tender points.

decision indicates that he did not rely upon such evidence in weighing either the opinions of Dr. Arora and Dr. Shaikh or Plaintiff's credibility but rather improperly relied upon the lack of objective testing and clinical findings. Consequently, the Court concludes that the ALJ's findings are not supported by substantial evidence and recommends that the case be remanded for further consideration of Plaintiff's physical RFC.[9]

## VI.    RECOMMENDATION

The Commissioner's decision is not supported by substantial evidence. Defendant's Motion for Summary Judgment (Docket # 19) should be **DENIED**. Plaintiff's Motion for Summary Judgment (Docket # 16) should be **DENIED**. The case should be **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g) in a manner consistent with this Report.

## VII.   NOTICE TO THE PARTIES

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of*

---

[9]    The Court also recognizes that the ALJ pointed to other evidence, which is established by the record, in finding Plaintiff less than fully credible. He noted that Plaintiff's reported motivation to obtain disability and she had a limited work history. (Tr. 21). However, there is no indication that the ALJ weighed this evidence against the findings of Dr. Arora and Dr. Shaikh that Plaintiff was not malingering. The ALJ also commented that Plaintiff demonstrated "good functionality and no apparent pain" when being unknowingly observed by Dr. Brown and that Plaintiff performed some light cleaning and cooking, driving, reading, visiting, exercising, and crossword puzzles. *Id.* Yet the ALJ did not discuss whether this evidence was inconsistent with the statements of Plaintiff, Dr. Arora, and Dr. Shaikh that Plaintiff had good days and bad days. These are issues that the ALJ should resolve upon remand.

*Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Secretary*, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: July 5, 2007                    s/ Mona K. Majzoub
                                       MONA K. MAJZOUB
                                       UNITED STATES MAGISTRATE JUDGE




**PROOF OF SERVICE**

I hereby certify that copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: July 5, 2007                    s/ Lisa C. Bartlett
                                       Courtroom Deputy